**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **CINDY HENLEY on behalf of** | ) | |
| **ROBERT HENLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO.: 1:06-CV-179** |
| | ) | |
| **MICHAEL J. ASTRUE,[1]** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**OPINION AND ORDER**

Plaintiff Cindy Henley ("Cindy") brings this action on behalf of her son, Robert Henley,

Jr. ("Robert"),[2] seeking judicial review[3] of the final decision of the Commissioner of Social

Security, who found pursuant to a Continuing Disability Review ("CDR") that Robert was no

longer entitled to child's Supplemental Security Income ("SSI"). (Docket # 1.) In short, because

the Administrative Law Judge ("ALJ") properly considered the opinion of Robert's treating

psychiatrist, the Commissioner's decision will be AFFIRMED.

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security; therefore, Michael J. Astrue is automatically substituted for Jo Anne B. Barnhart as the Defendant in this case. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d)(1).

[2] Robert was born on October 15, 1989. (Tr. 14.)

[3] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

1

## II. FACTUAL AND PROCEDURAL BACKGROUND[4]

Cindy, on behalf of Robert, initially filed an application for SSI on May 11, 1994. (Tr. 13.) The Social Security Administration ("SSA") approved the application and awarded SSI, finding Robert disabled as of May 1, 1994, due to his mental retardation, Attention Deficit Hyperactivity Disorder ("ADHD"), and speech problems. (Tr. 13.) Specifically, the SSA found that Robert met the listing for mental retardation. (Tr. 13.) In 1997, the SSA conducted its first CDR, determining that Robert had not experienced medical improvement and that he was still disabled. (Tr. 36-37, 40-42, 91-106.)

However, upon a second CDR, the SSA concluded that Robert ceased being disabled as of July 5, 2001. (Tr. 38-39, 43-48.) This determination was upheld on reconsideration, and Cindy requested a hearing. (Tr. 50-53.) On August 28, 2005, ALJ Bryan Bernstein conducted a hearing, at which Robert, who was represented by counsel, Cindy, and Robert's father testified. (Tr. 573-614.) The ALJ upheld the cessation of benefits, finding that Robert no longer met the listing for mental retardation, did not meet the listing for ADHD, and did not functionally equal a listing. (Tr. 10-26.) The Appeals Council denied Cindy's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 6-8.)

Cindy filed here on April 27, 2006, seeking review of the Commissioner's decision, and the matter is now fully briefed. Cindy concedes that Robert no longer meets the listing for mental retardation, but she disputes the ALJ's findings that Robert does not meet the listing for ADHD and does not functionally equal a listing, specifically claiming that the opinion of Doctor

---

[4] The administrative record in this case is voluminous (614 pages), and the parties' disputes involve only small portions of it, namely, the medical records and opinions of Robert's treating psychiatrist. Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

Marianne Parks, Robert's treating psychiatrist, supports a finding of disability.

In that regard, Dr. Parks performed an initial psychiatric evaluation of Robert on April 10, 2001, noting that Robert was oriented and moderately cooperative during the evaluation and that he denied problems with school. (Tr. 425.) However, she also observed that Robert's mood was labile, that his intellect was below average, that he had difficulty with tests of attention and concentration, and that he was oppositional, disliked rules and directions, and had poor insight and judgment. (Tr. 425.) Dr. Parks also noted that Robert's symptoms improved moderately on higher doses of Adderall. (Tr. 425.)

After conducting her evaluation, Dr. Parks concluded that Robert met the criteria for ADHD, which was complicated by speech problems, parents with limited education, and possible hereditary learning problems. (Tr. 426.) Dr. Parks also found that Robert experienced mood labiality, poor impulse control, and anger management problems. (Tr. 426.) She diagnosed Robert with ADHD, oppositional defiant disorder, and mild mental retardation by history, prescribing Wellbutrin SR to control Robert's mood labiality and ADHD. (Tr. 426-27.)

During April, May, June, and July, Dr. Parks adjusted the dosage of Robert's medication after she was notified that Robert was experiencing side effects and evening hyperactivity. (Tr. 429-33.) Ultimately, on August 1, Dr. Parks took Robert off of Wellbutrin SR and prescribed Concerta, as Robert demonstrated hyperactivity, poor impulse control, and poor response to rules and directions while on Wellbutrin. (Tr. 434-35.)

During Robert's August 28 visit, Cindy reported that the Concerta was "running out" in the evening and that Robert was talkative and hyperactive and had difficulty sitting still. (Tr. 437.) As a result, Dr. Parks increased the dosage of Concerta and prescribed short acting Ritalin.

(Tr. 437.)

On November 21, Cindy relayed that Robert had behavioral problems in the morning and afternoon. (Tr. 442.) Dr. Parks noted that Robert showed limited eye contact, insight, and social skills, and she added Tenex to Robert's medication regime to control his anger, outbursts, and poor impulse control. (Tr. 442.) However, Cindy reported on December 7 that the Tenex was not helping at all, relaying that Robert had hit her, thrown things, and stomped around and that he was verbally abusive. (Tr. 443.) Thus, Dr. Parks increased the dosage of Tenex. (Tr. 443.)

On January 24, 2002, Dr. Parks opined that Robert still demonstrated a poor understanding of social nuances, that his coping skills were limited, that he often responded with anger, and that he showed some signs of low self-esteem. (Tr. 448.) She also switched Robert's medication from Concerta to Metadate CD. (Tr. 448.)

Dr. Parks noted on March 22 that she was receiving conflicting reports from Cindy and Robert regarding Robert's school issues, with Cindy reporting that Robert's grades were dropping and that he had not turned in his homework for two weeks. (Tr. 455.) Dr. Parks increased Robert's stimulant medication in the evening to help him with his homework and behavior. (Tr. 456.) On May 14, Dr. Parks added Adderall XR to Robert's medication regime and noted that Robert was doing well other than some acting out related to recent stressors, namely his mother's car accident and his father's heart attack. (Tr. 458.)

During Robert's September 5 visit with Dr. Parks, Cindy reported that Robert was having problems at school, has few friends, has trouble expressing feelings other than anger, has little insight, and was frequently defiant. (Tr. 468.) Dr. Parks increased the Tenex dosage and prescribed Ritalin LA. (Tr. 468.)

4

On November 22, Dr. Parks received a letter from Robert's school, listing problems with his behavior that had purportedly worsened over the last couple of weeks. (Tr. 473-74.) Specifically, his teacher noted that Robert had difficulty concentrating, was losing homework and creating excuses for not having it done, was demonstrating a lack of independent organization, could not give reasons for answering basic questions, and had poor hygiene. (Tr. 473.) After having a discussion with Cindy and Robert on that same date, Dr. Parks noted that Robert continued to have problems at home; however, Cindy did report that Robert was doing significantly better on Metadate. (Tr. 474.) Opining that Robert has had little progress on his current medication regime, Dr. Parks prescribed Methylphenedate to assist with homework, as well as Trileptal, a mood stabilizer. (Tr. 474.)

Between Dr. Parks's treatment notes for the November 22, 2002, appointment and Robert's next appointment on May 15, 2003, Dr. Parks's records contain various information from Robert's school, including the results of psychological testing administered to Robert by the school psychologist on October 3, 2002. (Tr. 480-85.) One of these tests was the Adaptive Behavior Inventory ("ABI"), which measured Robert's current level of adaptive behavioral functioning, that is, Robert's ability to function independently and to meet the demands of social and personal responsibility.[5] (Tr. 484.) A general education teacher and a special education teacher completed separate ABI forms, and the ABI Composite Quotients computed for each teacher placed Robert in the mildly handicapped range of functioning. (Tr. 484.) Specifically, Robert was rated below average in the following skill sets: self-care skills, communication skills,

---

[5] The ALJ posed interrogatories to medical expert Thomas W. Vodde, Ph.D., specifically asking whether the ABI is "an accurate measure of statistical variance from a mean in a validly measured subject[.]" (Tr. 559.) Dr. Vodde responded that the ABI "is focused on school behaviors, yielding valid and reliable measure of functioning there, but should not be used to extrapolate to overall adaptive functioning." (Tr. 560.)

social skills, and academic skills. (Tr. 484.) The school psychologist then observed that Robert "does not appear to be able to function independently in the school environment and seems to need frequent supervision and direction to complete academic assignments and function at his peak level at school." (Tr. 485.)

Also included in Dr. Parks's records is a note from the school nurse dated December 10, 2002, and addressed to Robert's parents. (Tr. 486.) The nurse was concerned that Robert's medication was playing a role in his recent behavioral changes; therefore, she requested that Robert's parents consult with his doctor. (Tr. 486.)  Furthermore, in a note addressed to Cindy and dated April 14, 2003, the school listed the following concerns regarding Robert's behavior: (1) he does not show emotion; (2) he sits with a "blank stare"; (3) he makes excuses such as "my medicine made me say it" and "my mom wouldn't help me"; (4) he is uncooperative even when receiving individual help; (5) he is often "two steps behind" the class; and (6) he is not always honest. (Tr. 497.)

During Robert's May 15, 2003, appointment with Dr. Parks, she observed some improvement in Robert's social skills, specifically Robert's lively, creative, and attention-seeking talking. (Tr. 501.) Noting that Robert had "lots" of somatic complaints, including dizziness and vertigo, Dr. Parks lowered the dosage of Trileptal. (Tr. 501.)

Robert next visited Dr. Parks on October 9, 2003. (Tr. 534.) During this appointment, Dr. Parks stopped prescribing Methylphenedate and Metadate, opining that Robert had likely developed a tolerance to Metadate. (Tr. 534.) She also restarted Adderall XR, noting that Robert had responded well in the past to this drug. (Tr. 534.)

At the request of Robert's attorney, Dr. Parks answered a "Mental Impairment

Questionnaire" on November 22, 2003. (Tr. 539-48.) Her diagnoses included impulse control

disorder NOS, ADHD combined type, oppositional defiant disorder, and mild mental retardation

by history. (Tr. 386.) She opined that Robert's current Global Assessment of Functioning

("GAF") score was 65 and that his highest GAF score for the past year was 70.[6] (Tr. 39.) She

also observed that Robert's medications have helped him to control his behavior and make some

advances; however, her long-term prognosis was guarded due to his history and sensitivity to the

medications' side effects. (Tr. 541.)

After some preliminary questions, the questionnaire essentially tracked the criteria for

meeting the ADHD listing and for functionally equaling a listing. (Tr. 539-48.) For example, Dr.

Parks opined that Robert had marked inattention, marked impulsiveness, and marked

hyperactivity;[7] however, she also opined that Robert's "overall behavior has improved." (Tr.

540.)

Dr. Parks then rendered opinions regarding various functional limitations recited in the

ADHD listing, opining that Robert had "marked" limitations in the domains of

cognitive/communication functioning, social functioning, and personal/behavioral functioning;

but had "less than marked" limitations in the domain of concentration, persistence, and pace. (Tr.

542-45.) In regard to Robert's limitations in social functioning, Dr. Parks observed that Robert

has problems with learning, anger, judgment, and understanding verbal and nonverbal social

---

[6] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American
Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). GAF
scores of 65 and 70 reflect "some mild symptoms . . . [or] some difficulty in social, occupational, or school
functioning . . . but generally functioning pretty well." *Id.* at 34.

[7] A claimant is required to demonstrate marked inattention, marked impulsiveness, and marked
hyperactivity to meet the ADHD listing's criteria for paragraph A. *See infra* Part III.C.

7

cues; has poor self-esteem; and demonstrates a lack of insight and a need for control. (Tr. 543.)

She gleaned from patient, parent, and teacher reports that Robert has few friends; has limited

empathy; tends to misunderstand social boundaries; and copes by seeking to intimidate, by

acting out, by arguing, or by isolating himself. (Tr. 543.)

Regarding personal/behavioral functioning, Dr. Parks opined that Robert has "shown

improvement as long as he is maintained on medication to control his excessive aggressive

tendency." (Tr. 544.) She also noted, however, that Robert has poor self-esteem, has problems

with social adaptation, and lacks basic common sense and judgment. (Tr. 544.) She further wrote

that Robert has few friends and that Robert's own report that he has friends is unclear since his

definition of friendship includes anyone who gives him attention, whether positive or negative.

(Tr. 544.)

Dr. Parks then rendered opinions in the six domains of functional equivalence, finding

that Robert had "marked" limitations in the domains of acquiring and using information,

interacting and relating with others, and self care; however, she also opined that Robert had "less

than marked" limitations in the domain of attending and completing tasks and had "no evidence"

of limitations in the domains of moving about and manipulating objects and health and physical

well-being. (Tr. 546-48.) Regarding Robert's ability to acquire and use information, Dr. Parks

opined that Robert can acquire new information through memorization but cannot use the

information in problem-solving. (Tr. 546.) She based her opinion on personal observations,

review of test findings, assessment, and history resulting in Robert's diagnoses. (Tr. 546.)

Robert's last appointment of record with Dr. Parks occurred on December 16, 2003. (Tr.

553.) Dr. Parks observed that despite being on Trileptal, Robert showed little insight, remained

8

socially immature, and was not a good candidate for therapy. (Tr. 553.) It was also relayed to her that Robert was still having problems focusing, was defiant, and had poor impulse control. (Tr. 553.) Dr. Parks maintained Robert's Trileptal dosage but increased the dosage of Adderall. (Tr. 553.)

## II. STANDARD OF REVIEW

Section 405(g) of the Social Security Act grants the district court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). To determine if substantial evidence exists, the court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Scott*, 297 F.3d at 593. Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Williams v. Apfel*, 179 F.3d 1066, 1071 (7th Cir. 1999). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Scott*, 297 F.3d at 593.

## III. DISCUSSION

### A. Legal Framework

After a child is found disabled, the SSA periodically conducts a CDR to determine

9

whether the child is still eligible for benefits. 20 C.F.R. § 416.994a(a). The CDR is comprised of

three steps. *See* 20 C.F.R. § 416.994a(b). First, the SSA considers whether the child has

experienced "medical improvement" since the previous determination, which is referred to as the

Comparison Point Decision ("CPD").[8] 20 C.F.R. § 416.994a(b)(1). Second, if the SSA finds

medical improvement, it examines whether the child's impairment still meets or medically or

functionally equals the severity of the listing it met or equaled at the time of the CPD.[9] 20 C.F.R.

§ 416.994a(b)(2).

Third, if the impairment no longer meets or equals the listing it previously met or

equaled, the SSA evaluates whether the child is currently disabled, which includes consideration

of any current impairments that the child did not have at the time of the CPD. 20 C.F.R. §

416.994a(b)(3). A child is currently disabled if (1) he has not engaged in any substantial gainful

activity; (2) he has a "severe" impairment or combination of impairments; and (3) his

impairment or combination of impairments meets, medically equals, or functionally equals the

severity of one of the specifically listed impairments. 20 C.F.R. §§ 416.994, 416.994a(b)(3).

## B. The ALJ's Decision

In a written decision issued on September 5, 2005, the ALJ determined that Robert's

disability "ceased" on July 5, 2001. (Tr. 13-26.) At step one, he determined that Robert had

experienced medical improvement in the conditions that were present at the time of the CPD,

that is, mental retardation, ADHD, and speech/language delays. (Tr. 14-16, 25.) The ALJ further

---

[8] If there is no medical improvement, the SSA will find, subject to a few exceptions, that the child is still disabled. *See* 20 C.F.R. §§ 416.994a(b)(1), 416.994a(e)-(f).

[9] If the child's impairment still meets the listing, the SSA will find, subject to a few exceptions, that the child is still disabled. *See* 20 C.F.R. §§ 416.994a(b)(2), 416.994a(e)-(f).

determined at step two that Robert's mental retardation no longer meets listing 112.05, which was the listing he met at the CPD.[10] (Tr. 14, 16-20, 25.) Finally, the ALJ determined at step three that Robert was not currently disabled. (Tr. 20-25.) In that regard, he found that Robert has not engaged in substantial gainful activity since his onset date and that he "has borderline intellectual functioning and ADHD which are 'severe' . . . "; however, the ALJ concluded that Robert "has had no impairments that met, medically equaled, or functionally equaled a listing since July 5, 2001." (Tr. 14, 20-25.) Specifically, the ALJ found that Robert's ADHD does not meet or medically equal the criteria of listing 112.11B and that Robert's impairments do not functionally equal a listing. (Tr. 20-25.)

Cindy does not oppose the ALJ's findings with respect to Robert's mental retardation, instead contesting the findings that Robert's ADHD does not meet the criteria of listing 112.11B and that his impairments were not functionally equal to a listing. In support of her argument, Cindy relies on the opinion of Dr. Parks, who essentially found that Robert meets the criteria of listing 112.11B and that he also functionally equals a listing. Cindy argues that the ALJ improperly discounted the opinion of Dr. Parks and consequently that the case must be remanded for a proper consideration of Dr. Parks's opinion.[11]

### C. Relevant Criteria for Meeting or Functionally Equaling a Listing

Before the Court considers Cindy's arguments regarding Dr. Parks's opinion, it is helpful

---

[10] The ALJ also noted that "the State Agency has never found that Robert met the criteria of listing 121.11 for ADHD or the speech impairment listings at the CPD." (Tr. 16.)

[11] Cindy also initially argued in her Opening Brief that the ALJ violated Robert's right to due process by failing to honor his attorney's request for a supplemental hearing to question Dr. Vodde. In her Reply Brief, however, Cindy concedes that such a request "was not clear based on the record"; therefore, no due process violation occurred. (Reply Br. 1.)

to delineate how a child's impairments meet listing 112.11 for ADHD, and alternatively, how a

child's impairments can functionally equal a listing. In that regard, listing 112.11 provides:

> 112.11 ***Attention Deficit Hyperactivity Disorder***: Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.

> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

> A. Medically documented findings of all three of the following:

> 1. Marked inattention; and

> 2. Marked impulsiveness; and

> 3. Marked hyperactivity;

> And

> B. For . . . children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.11. Paragraph B2 of 112.02 provides:

> For children (age 3 to attainment of age 18), resulting in at least two of the following:

> a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

> b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

> c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is

12

needed and available) and including, if necessary, appropriate standardized tests; or

    d. Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.02.

    A child's impairments meet listing 112.11 when the criteria of both paragraphs A and B are satisfied.[12] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00. Here, the ALJ determined that Robert did not meet the criteria for paragraph B of listing 112.11. A child meets the criteria for paragraph B if he has a "marked" limitation in two of the domains of functioning outlined in listing 112.02 or an "extreme" limitation in one domain. 20 C.F.R. § 416.925(b)(2)(ii). A marked limitation is one that is "more than moderate but less than extreme" and arises when "the degree of limitation is such as to interfere seriously with the ability to function . . . independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00. On the other hand, a limitation is "extreme" when it "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(I).

    Cindy apparently concedes that substantial evidence supports the ALJ's conclusion that Robert does not have marked limitations in the domain of cognitive/communicative functioning and the domain of maintaining concentration, persistence, or pace. She argues, however, that Dr. Parks's opinion reveals that Robert has marked limitations in social functioning and personal

---

[12] "The purpose of the criteria in paragraph A is to substantiate medically the presence of a particular medical disorder," while "[t]he purpose of the paragraph B criteria is to describe impairment-related functional limitations which are applicable to children." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00. Accordingly, "[t]he functional restrictions in paragraph B must be the result of the mental disorder which is manifested by the medical findings in paragraph A." *Id.*

functioning, and thus, he meets the criteria for paragraph B of listing 112.11.

But even if Robert does not meet a specific listing, he can still be found disabled if he functionally equals a listing. To determine whether a child functionally equals a listing, an ALJ considers six domains of functioning that are "intended to capture all of what a child can or cannot do": (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for himself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). A child functionally equals a listing if his impairments or combination of impairments result in a marked limitation in two of these domains of functioning or an extreme limitation in one domain. 20 C.F.R. § 916.926a(a).

Here, the ALJ determined that Robert's impairments do not result in a marked limitation in two domains of functioning or an extreme limitation in one domain. Cindy apparently concedes that Robert has neither marked nor extreme limitations in the domains of attending and completing tasks, moving about and manipulating objects, and health and physical well-being. However, Cindy maintains that Dr. Parks's opinion supports a finding of marked limitations in the domains of acquiring and using information, interacting and relating with others, and caring for himself; therefore, according to Cindy, Dr. Parks's opinion also supports a finding that Robert functionally equals a listing.

With this framework in mind, the Court now turns to Dr. Parks's opinion.

**D. The ALJ's Analysis of Dr. Parks's Opinion Does Not Necessitate a Remand**

When rendering his decision that Robert was no longer disabled, the ALJ evaluated Dr. Parks's opinion and concluded that it "does not warrant controlling or great weight." (Tr. 18-19.)

14

Although Cindy offers a laundry list of arguments for why she believes the ALJ improperly evaluated Dr. Parks's opinion, her request for a remand largely ignores the rest of the ALJ's opinion, in which the ALJ marches through all of the domains of functioning and gives specific reasons grounded elsewhere in the record for why Robert has no marked limitations.[13] While nitpicking at the ALJ's analysis of Dr. Parks's opinion, Cindy fails to argue why, in light of the other cited evidence, the ALJ's decision to cease Robert's benefits is not supported by substantial evidence, which, of course, is the standard with which this Court reviews the ALJ's decision.[14] *See Scott*, 297 F.3d at 593; *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (requiring the court to "give the opinion a commonsensical reading rather than nitpicking at it") (quoting *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000))).

In fact, as the Court will discuss below, Cindy's argument for remand is essentially an invitation for the Court to substitute its own judgment for that of the ALJ in the hopes that the Court will find that the evidence bolstering Dr. Parks's opinion outweighs the evidence that favors giving the opinion diminished weight. Such an invitation must be declined. *See Scott*, 297 F.3d at 593 (noting that reviewing courts "may not substitute [their] judgment for that of the ALJ by reconsidering the facts, reweighing the evidence or resolving factual disputes").

---

[13] The Commissioner high-lights much of the ALJ's reasoning in its Response Brief, so it is unnecessary to review the ALJ's opinion again here.

[14] Although Cindy's Reply Brief suggests that the ALJ committed legal error, thus necessitating a remand even if the ALJ's opinion was otherwise supported by substantial evidence, Cindy utterly fails to cite any statute, regulation, social security ruling, Seventh Circuit case, or any other law mandating a remand. *See Burling v. Barnhart*, No. 01 C 3189, 2002 WL 731129, at *8 (N.D. Ill. Apr. 24, 2002) ("[T]he courts need not entertain undeveloped and perfunctory arguments no matter what the issue."). Furthermore, Cindy's Opening Brief, in which she spends nineteen pages advancing the facts and only four pages advancing at least seven arguments, fails to flesh out the legal basis for many of her arguments.

15

*1. The ALJ's Determination That Dr. Parks's Opinion Is Internally Inconsistent Will Not Be*

*Remanded*

In giving diminished weight to Dr. Parks's opinion, the ALJ listed several inconsistencies between the views expressed in Dr. Parks's questionnaire and her treatment records. For example, the ALJ found that Dr. Parks's opinion that Robert was improving and was responding to medications was inconsistent with her opinion that Robert had marked limitations in various domains of functioning. Cindy argues that Dr. Parks's opinion regarding Robert's improvement and his response to medications pertained only to his ability to pay attention; therefore, according to Cindy, the ALJ "mist[ook] improvement in one area for improvement in all areas." (Opening Br. of Pl. in Social Security Appeal ("Opening Br.") 23.)

Cindy's argument is perplexing, as she fails to provide any explanation, much less any legal citation, for why the ALJ's alleged "mistake" affects his conclusion that Dr. Parks's opinion was inconsistent.[15] More importantly, Cindy's argument that Robert only experienced improvement in his ability to pay attention is clearly not supported by the record, as Dr. Parks opined in the questionnaire that Robert's "overall behavior has improved," that the medications generally "have helped Robert to control his behavior and make some advances," and that Robert has specifically shown improvement in the domain of personal/behavioral functioning "as long as he is maintained on medication to control his excessive aggressive tendency." (Tr. 540-44.)

Cindy also argues that the ALJ engaged in a selective review of the evidence by failing to

---

[15] To explain, even if Dr. Parks had opined that Robert only showed improvement in his ability to pay attention, this opinion would still seemingly be inconsistent with her opinion that Robert had marked limitations in any of the domains of functioning in which an ability to pay attention would be pertinent.

consider specific treatment notes that she believes are consistent with Dr. Parks's conclusion that Robert's functioning was markedly impaired despite any improvements.[16] In that regard, an ALJ has a duty to "sufficiently articulate [his] assessment of the evidence to assure us that [he] considered the important evidence and . . . to enable us to trace the path of [his] reasoning." *Scott*, 297 F.3d at 595 (quoting *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999)); *see also Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) ("[T]he ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence . . . .") (quoting *Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985))). Here, the ALJ met his burden of minimal articulation, as he thoroughly analyzed Dr. Parks's opinion, giving specific reasons for rejecting it that enables this Court to trace his reasoning on review.[17] Essentially, Cindy is asking the Court to reweigh the evidence, hoping that we will conclude that her evidence favoring the consistency of Dr. Parks's opinion outweighs the ALJ's evidence of inconsistency; however, it is improper for the Court to reweigh the evidence or resolve conflicts in the record. *See Scott*, 297 F.3d at 593.

When rendering Dr. Parks's opinion inconsistent, the ALJ also opined that "Dr. Parks

---

[16] Specifically, Cindy points to the following evidence from Dr. Parks's treatment records: (1) Dr. Parks's August 1, 2001, note that Robert demonstrated poor impulse control and a poor response to rules and directions; (2) Cindy's November 21, 2001, report that Robert was having behavioral problems in the morning and afternoon; (3) Cindy's December 7, 2001, report that Robert had hit her, was verbally abusive, threw things, and stomped around; (4) Dr. Parks's January 2, 2002, note that Robert demonstrated a poor understanding of social nuances, that his coping skills are limited, that he often responds with anger, and that he shows some signs of low self-esteem; (5) Cindy's March 22, 2002, report that Robert's grades were dropping; and (6) teachers' reports regarding Robert's behavior in school.

[17] In fact, of the six pieces of evidence that Cindy argues the ALJ did not consider, at least two were specifically mentioned by the ALJ in the body of his opinion. (*See* Tr. 19.) Furthermore, if the Court was to credit Cindy's argument, a burden would be placed on an ALJ whereby he would be compelled to recount every clinician's note in its totality or face the possibility of remand–a burden that, as the Court indicated above, is clearly not contemplated by Seventh Circuit Case law. *See Scott*, 297 F.3d at 595. Such a burden would be particularly high here, as Dr. Parks's treatment records consume nearly 160 pages of the record.

stated in the questionnaire that Robert was improving; if he is markedly limited now, then this implies he must have had extreme limitations before and there is *no evidence* that he was ever that dysfunctional." (Tr. 18 (emphasis added).) Cindy argues that the ALJ's statement that there is "no evidence" of extreme dysfunction is not entirely accurate because there is one piece of evidence demonstrating that Robert had an extreme limitation–the October 2002 ABI. Specifically, Robert's special education teacher rated Robert's self-care skills as a "two," which Cindy maintains is three standard deviations below the norm and is considered "extreme" by the State Agency.[18]

However, a remand of the ALJ's determination that there was "no evidence" of extreme limitations, based solely on this one piece of evidence, would be futile. *Suarez v. Barnhart*, No. 05 C 6401, 2006 WL 3505845, at *15 (N.D. Ill. Dec. 6, 2006) ("No principle of administrative law or common sense requires [this court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.") (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989))). As the Court will discuss in more detail below, the ALJ properly questioned the validity and reliability of the ABI. Furthermore, this evidence only demonstrates an extreme limitation in one area of functioning; Cindy fails to provide evidence of extreme limitations in any other areas of functioning, which means that Dr. Parks's opinion is still inconsistent with respect to these other areas of functioning.

The ALJ also rejected Dr. Parks's opinion because the GAF scores of 65 and 70 that she

---

[18] Curiously, Cindy argues in her Reply Brief that the ALJ "was apparently unaware of this piece of evidence; thus, his review was selective." (Reply Br. 3.) Although the ALJ did not specifically discuss the special education teacher's rating of Robert's self-care, the record and the ALJ's opinion clearly establish that the ALJ considered the ABI. For example, the ALJ posed interrogatories to Dr. Vodde, specifically questioning Dr. Vodde about the ABI, and the ALJ subsequently discussed both the ABI and Dr. Vodde's response to the interrogatories in his opinion. As discussed above, the ALJ need not specifically discuss every piece of evidence, so long as he meets his burden of minimal articulation. *Scott*, 297 F.3d at 595.

assigned to Robert were inconsistent with marked limitations of functioning. Cindy counters the ALJ's reasoning with an incoherent argument containing no legal citation:

> [T]he current GAF generally involves only a very short period of time, and the highest for the year rating refers to the highest level of functioning for at least a few months. *See* DSM-IV-TR at 33. However, in assessing functioning under the listing and functional equivalence, the issue is what is his functioning in comparison to other individuals the same age for an entire year or longer. Thus, these ratings alone are not enough to establish inconsistency.

(Opening Br. 22-23.)

Perhaps Cindy is arguing that even though Robert's GAF scores reflect that his current and highest levels of functioning were not marked, his overall level of functioning during the course of an entire year or longer could still be quite marked. According to this argument, because the more comprehensive level of functioning is reflected in Dr. Parks's opinion regarding the various domains of functioning, Dr. Parks's GAF scores are not necessarily inconsistent with her ultimate opinion that Robert has marked limitations. The questionnaire, however, does not indicate whether Dr. Parks assessed Robert's level of functioning "for an entire year or longer" or whether Dr. Parks assessed Robert's current level of functioning, as Robert's attorney included no such instructions when asking Dr. Parks to render opinions regarding the various domains of functioning.

Furthermore, Cindy fails to appreciate that the GAF scores were just one of the factors that the ALJ relied on when determining that Dr. Parks's opinion was inconsistent; accordingly, her argument that GAF scores "alone are not enough to establish inconsistency" carries little weight. Because it is the ALJ's duty to resolve conflicts in the record, *see Scott*, 297 F.3d at 593, the Court will not second-guess the ALJ's judgment that the GAF scores revealing only mild limitations in functioning provide one indicia of inconsistency in Dr. Parks's opinion.

19

Finally, the ALJ offered the following explanation for rendering Dr. Parks's opinion inconsistent:

> Dr. Parks indicated that Robert had marked inattention, marked hyperactivity, and marked impulsivity, but he did not have marked limitation of concentration, persistence, or pace. It is hard to see how a child has marked inattention, hyperactivity, and impulsivity, but does not have marked limitation of concentration, persistence, or pace.

(Tr. 18-19.)

Cindy argues that in reaching this conclusion, "the ALJ fails to understand the difference between diagnosis and function." (Opening Br. 24.) Specifically, Cindy maintains:

> Marked inattention, marked hyperactivity and marked impulsiveness, are the "A" criteria of the Attention Deficit Hyperactivity Disorder listing which refers to diagnosis. *See* 20 CFR, pt.404, subpt. P, app. 1, pt. A, listing 112.11A. The listing indicates that these three things are manifested developmentally. (Id.) Although the medications may reduce these symptoms, the individual still has the disease. However, the "B" criteria have to do with the broad area of functioning.

(Opening Br. 24.)

Like many of the previous arguments she presents here, Cindy's argument is perfunctory. Her argument simply amounts to reciting the purposes of the paragraph A and paragraph B criteria; she fails to explain how these purposes affect the ALJ's determination that Dr. Parks's opinion is inconsistent. *See Burling*, 2002 WL 731129, at *8. Furthermore, Cindy's argument seemingly presumes that Dr. Parks appreciated the distinctions between the paragraph A and paragraph B criteria when rendering her opinion; however, there was no specific instruction delineating these distinctions in the questionnaire.

In sum, Cindy fails to provide a convincing reason for why the ALJ's determination that Dr. Parks's opinion was inconsistent requires a remand.

*2. The ALJ's Findings Regarding the Specific Domains of Functioning Do Not Require Remand*

*for a Reconsideration of Dr. Parks's Opinion*

In addition to his overarching finding that Dr. Parks's opinion was internally inconsistent, the ALJ rejected Dr. Parks's opinion as it pertained to specific domains of functioning–namely, the domains of social functioning and personal functioning recited in paragraph B of listing 112.02 and the domain of acquiring and using information, which is considered when determining whether a child functionally equals a listing. Cindy disputes the ALJ's findings, requesting a remand so that the ALJ can reconsider Dr. Parks's opinion that Robert had marked limitations in these specific domains of functioning. Cindy's argument runs into a problem at the outset–contrary to her thinking, Dr. Parks's opinion regarding Robert's functional limitations is an opinion on issues specifically reserved to the Commissioner, and is, therefore, not entitled to any special significance.[19] *See* SSR 96-5p (providing that "[w]hether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings" is an issue reserved to the Commissioner); *see also* 20 C.F.R. §§ 404.927(e)(2)-(3); 416.926a(n); *Frobes v. Barnhart*, 467 F. Supp. 2d 808, 818 (N.D. Ill. 2006).

Because Dr. Parks's opinion is not entitled to any special significance, it is difficult to understand how a remand based on any alleged peccadillos in the ALJ's decision to discount Dr. Parks's opinion would make a difference, particularly given the other substantial evidence supporting the ALJ's conclusion that Robert had no marked limitations. *See Suarez*, 2006 WL 3505845, at *15. Of course, Cindy fails to provide the Court with any legal explanation for why

_____

[19] Indeed, "[g]iving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether the individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." SSR 96-5p; *see also Frobes*, 467 F. Supp. 2d at 818.

a remand would make a difference here, instead choosing to nitpick at the ALJ's decision to discount Dr. Parks's opinion. Accordingly, the Court now turns to Cindy's specific arguments.

With respect to whether Robert met the requirements of listing 112.11, the ALJ rejected Dr. Parks's opinion that Robert displayed marked limitations in the domain of social functioning, finding that this opinion was not well supported. (Tr. 19.) Cindy, suggesting that Dr. Parks's opinion was indeed well supported, contends that the ALJ should have attached greater significance to the school's ABI results, which Dr. Parks considered when rendering her opinion.[20]  In support of her argument, Cindy cites to 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00C, which provides that "standardized tests [are] the preferred method of documentation . . ." for determining the level of impairment in the various domains of functioning. However, the social security regulations do not require an ALJ to accept the results of a standardized test, instead providing that "[w]hen we do not rely on test scores, we will explain our reasons for doing so . . . in our decision." 20 C.F.R. § 416.926a(e)(4)(iii)(B).

Here, the ALJ explained the reasons for not relying on the ABI. Specifically, the ALJ found that although the school psychologist who administered the ABI "thought the test was reliable and valid," this opinion was not sufficient. (Tr. 17.) Instead, the ALJ gave greater weight to the opinion of Dr. Vodde "by virtue of his education and experience." (Tr. 17.) Dr. Vodde opined that the ABI "is focused on school behaviors, yielding valid and reliable measure of functioning there, *but should not be used to extrapolate to overall adaptive functioning*." (Tr. 560 (emphasis added).) Accordingly, the ALJ met his regulatory duty by giving reasons for rejecting

---

[20] Cindy also argues that the ALJ engaged in selective review by not specifically discussing Dr. Parks's observations that Robert's definition of friendship can be deceptive and that Robert demonstrated a need for control and social cues and showed a lack of insight and self-esteem. However, as noted above, the ALJ need not consider every piece of evidence, and he clearly met his burden of minimum articulation with respect to Dr. Parks's opinion.

the ABI scores, and this Court will not substitute its judgment for that of the ALJ.[21] *See Scott*, 297 F.3d at 593.

Furthermore, in advancing the argument that the ALJ should have attached more significance to the ABI results, Cindy is once again inappropriately asking the Court to reweigh the evidence. Here, the ALJ wrote four paragraphs regarding Robert's alleged limitations in social functioning, accepting other evidence in the record over Dr. Parks's opinion and the ABI results. (Tr. 19-20.) Although Cindy seems to suggest that when standardized test scores conflict with other evidence in the record the ALJ should accept the test scores, the regulations do not support such a contention, providing simply that "[i]f there is a material inconsistency between your test scores and other information in your case record, we will try to resolve it."[22] 20 C.F.R. § 416.926a(e)(4)(iii). Here, the ALJ resolved the conflict in the record, and the Court will not reweigh this conflicting evidence. *See Scott*, 296 F.3d at 953.

The ALJ also rejected Dr. Parks's opinion that Robert had marked limitations in the domain of personal functioning, "particularly when the beneficial effects of treatment are taken into consideration." (Tr. 20.) Cindy essentially advances the same argument that she advanced

---

[21] In her Reply Brief, Cindy objects to Dr. Vodde's answers to the ALJ's interrogatories; however, because she failed to request a supplemental hearing to cross-examine Dr. Vodde, her objections are deemed waived. *See Pope v. Sullivan*, No. S 87-430,1991 WL 520499, at *6 (N.D. Ind. Oct. 31, 1991) (concluding that the failure of claimant's attorney to cross-examine a consulting physician regarding his answers to post-hearing interrogatories waived the right to cross-examination).

Even if no waiver had occurred, Cindy's objections are simply a red-herring. She argues that the ALJ's interrogatories led Dr. Vodde astray such that "[t]he responses of [Dr. Vodde] indicate that he believed that 'adaptive functioning' refers to the mental retardation issue." (Reply Br. 4.) Cindy fails to explain how this objection has anything to do with Dr. Vodde's attack on the ABI, particularly with respect to his opinion that the ABI should not be used to extrapolate to overall adaptive functioning.

[22] Moreover, the regulations provide that "we will not rely on any test score alone" and that "[w]e will consider your test scores together with the other information we have about your functioning. 20 C.F.R. § 416.926a(e)(4)(i)-(ii).

23

with respect to social functioning–that the ALJ should have attached significant weight to the ABI results. Accordingly, the Court does not need to rehash this unsuccessful argument again.[23] In sum, Cindy fails to demonstrate that a remand is required in order for the ALJ to reevaluate whether Robert met the requirements for listing 112.11B.

With respect to whether Robert functionally equaled a listing, Cindy's sole challenge in her Opening Brief is to the ALJ's determination that Robert had less than a marked limitation in the domain of acquiring and using information. As the Commissioner points out, to be functionally equivalent to a listing, Robert must have marked limitations in at least two domains of functioning, *see* 20 C.F.R. § 916.926a(a); therefore, any remand for reconsideration of only one domain would be fruitless. Attempting to remedy this problem, Cindy places a two-sentence argument in her Reply Brief, contending that "Dr. Parks found that [Robert] had a marked limitation in 'interacting and relating with others' and in 'self-care.' (Tr. 394-395) Thus, contrary to the assertions of the Commissioner there were at least two areas of 'marked' limitation found by Dr. Parks." (Reply Br. 2.)

Cindy's proposed remedy presents three problems. First, she misinterprets the argument by the Commissioner, who contends only that Cindy's argument, as presented, was insufficient to require a remand; the Commissioner makes no allegations regarding Dr. Parks's opinion. Second, insofar as Cindy's argument was not advanced until her Reply Brief, it has been waived. *See Leonard v. Barnhart*, No. 06-C-0207-C, 2006 WL 3523103, at *14 (W.D. Wis. Dec. 4,

---

[23] In addition, Cindy argues that "simply because [Robert's] medication has improved some of his symptoms, especially the attention and concentration, does not necessarily mean that he has improved in personal functioning." (Opening Br. 25.) This position evidences a certain lack of attention on Cindy's part, as Dr. Parks specifically opined regarding Robert's personal functioning that he "has shown improvement as long as he is maintained on medication . . . ." (Tr. 544.)

2006) (noting that arguments raised for the first time in a reply brief are waived). Third, Cindy

utterly fails to make any argument that the ALJ's findings with respect to the domains of

"interacting and relating with others" and "self-care" contain legal error or were not supported

by substantial evidence. *See Burling*, 2002 WL 731129, at *8. Accordingly, her argument for

remand with respect to the ALJ's conclusion that Robert does not functionally equal a listing

fails at the outset.

     Nevertheless, the Court will consider Cindy's argument regarding the domain of

acquiring and using information, even though it is also a loser. In that regard, the ALJ rejected

Dr. Parks's opinion that Robert had a marked limitation in the domain of acquiring and using

information, noting that Dr. Parks's opinion implies mental retardation. The ALJ then goes on to

explain why Dr. Parks's diagnosis of mild mental retardation is "questionable" in light of testing

conducted after the CPD. (Tr. 18.) Cindy reads too much into the ALJ's determination,

maintaining that the ALJ "mistakenly believed that mild mental retardation was a necessary

prerequisite of marked limitation in [the domain of acquiring and using information]"[24] (Reply

Br. 2); however, nowhere in the ALJ's opinion is this proposition asserted.

     In fact, on its face there is nothing "mistaken" about the ALJ's determination. Dr. Parks

wrote in the questionnaire that she based her opinion regarding Robert's ability to acquire and

use information on "personal observation[,] review of test finding[s], assessment[,] and history

*resulting in his diagnosis*[.]" (Tr. 546 (emphasis added).) One of Dr. Parks's diagnoses was mild

mental retardation; accordingly, the ALJ accurately portrayed the record when he reasoned that

Dr. Parks's opinion regarding Robert's ability to acquire and use information implied her

---

[24] Cindy also asserts that by making this alleged "mistake," the ALJ committed an error of law requiring
remand, but curiously she cites no law to support this contention.

diagnosis of mild mental retardation, a diagnosis that the ALJ found "questionable."

Furthermore, whether Robert suffers from mild mental retardation is ostensibly probative of the issue of whether he is limited in his ability to acquire and use information, so the ALJ committed no legal error in considering this diagnosis when he determined that Robert was not markedly limited in this domain. *See Scales v. Barnhart*, 363 F.3d 699, 704-05 (8th Cir. 2004) (considering a psychologist's opinion that a diagnosis of mental retardation was inappropriate for the claimant when determining that the ALJ's decision regarding the claimant's ability to acquire and use information was supported by substantial evidence). Moreover, in addition to the mild mental retardation diagnosis, the ALJ cites other evidence in the record when rendering his opinion that Robert did not have a marked limitation in his ability to acquire and use information. Thus, his opinion regarding this domain is supported by substantial evidence.[25]

---

[25] Cindy also argues that the ALJ failed to consider the school psychologist's observations that Robert "does not appear to be able to function independently in the school environment and seems to need frequent supervision and direction to complete academic assignments and function at his peak level at school." (Tr. 485.) However, it is clear that the ALJ considered the report that contains this statement, as he discussed the ABI results, as well as the results of WISC-III testing; therefore, the ALJ met his burden of minimal articulation with respect to this report. *See Scott*, 297 F.3d at 595. Furthermore, Cindy fails to explain how this piece of evidence supports her contention that Robert has a marked limitation in acquiring and using information, as the evidence seems to fall under the domain of attending and completing tasks. *See* 20 C.F.R. § 416.926a(b)(1). Finally, Cindy is once again inappropriately asking the Court to reweigh this allegedly favorable statement against the unfavorable evidence the ALJ cites in his decision.

**IV. CONCLUSION**

Because the ALJ properly considered Dr. Parks's opinion, his decision is AFFIRMED.

The Clerk is directed to enter a judgment in favor of the Commissioner and against Cindy

Henley.

SO ORDERED.

Enter for March 26, 2007.

S/ Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge